He's all right here. Here's your three. It's a little help for the initial district is now open. So let's adjourn. Please be seated. And arson. I understand that we have some shared time here and we will do our best to give you that time. And certainly we may be asking you questions beyond that time. But hopefully we'll stay with it. So I believe, Mr. Adams, we're starting. Good morning. Good morning. Again, my name is David Adams and seated at the table is Mr. Levitt. We represent the appellant cross appellee, Greg Jones. I will be addressing the stock issue raised by Greg's appeal. I will also respond to the contract issue raised by Karen's cross appeal. Mr. Levitt will be addressing the maintenance issue raised by Greg's appeal. Before we go further, I'd like to thank the court and Karen's counsel, for that matter, for extending us the courtesy of having, by allowing both of us to argue this brief and also for rescheduling the oral argument earlier. I know the court has read the briefs and is familiar with the background regarding hedge funds and Greg's work. That said, it is important to recall that there are three funds at issue here in this case. For simplicity, it's the 2001 fund, the 2004 fund, and the 2011 fund. There was also another fund, a 1998 fund, which is not at issue here, but it's important not to confuse these funds. Is the 2011 fund contemplated in the marital settlement agreement or the property settlement agreement? Absolutely, Your Honor. I would direct the court's attention to, and there's two points here, page three of our cross, our combined responsive brief and reply brief. In section 18 of the PSA, of the property settlement agreement, it says that, and this is paragraph 18.1 and this is direct quote, Karen has no interest in any Edgewater funds formed subsequent to the 2004 fund, including without limitation the Edgewater fund that is currently engaged in fundraising activities. That fund that was, that nascent fund which is currently engaging in fundraising activities was the 2011 fund. I would also refer the court, the page before that, in section 11 of the agreement, in the bolded part it says Karen's 50% share shall not include any consideration received by Greg with respect to his provision of future services to the interested party. That interested party turned out to be Lazard, or on account of any future investment transactions effected on behalf of the interested party. Respectfully, the trial court's inquiry with respect to the property settlement agreement should have ended after reading these two provisions in the property settlement agreement. Well, the trial court seemed to separate them out. The trial court seemed to separate whether she claimed an interest in the fund, which is provided before there, and whether she claimed an interest in the ISC and Ernst shares. I mean, you're saying they're the same thing, correct? I'm saying, well, if I may, I think that the trial court's error here in this case was twofold, and this will address your question, Judge. It failed to recognize that the Lazard agreement, that the Lazard transaction had two parts, one which affected Karen. That is, the first part of the deal by Lazard, the first part of the deal was a purchase by Lazard of a stake in Greg and his Edgewater partners' ongoing business. That is, the 2001 and the 2011 funds. And when I talk about the funds, I'm really talking about, and I use that as a shorthand, for the management fees which Greg and his partners receive, as well as the carry interests that they receive. They don't actually own the funds. The people who invest in the funds do that. So that part of the deal, the agreement contemplated, and Karen was entitled to share in that because she gave up her marital rights in the property settlement agreement in exchange for being able to share with Greg in the 2001 and the 2004 funds. But the second part of the deal, and this is a very important distinction that I think was lost on the trial court, and the word that I'd like to convey here to use this is that, unfortunately, the trial court sort of conflated the consideration for the second part of the deal into the consideration for the first part of the deal, and as well as it imported the concept of consideration from the Lazard transaction into the property settlement agreement, an agreement which predated the Lazard agreement itself. And by that, I mean this. The second part of the deal was a joint creation by Lazard and the Edgewater partners, including Greg, of a new business venture going forward. And in that deal, Lazard obtained the personal services of not just Greg but his Edgewater partners. In this hedge fund or equity fund business, it is people like Greg who are the rainmakers, the people who actually go out and raise the money. In this particular instance, so that the parties and the personal services that they wanted to obtain from Greg and his partners who were developing the nascent 2011 fund and subsequent funds that would come into existence thereafter. Well, she wasn't seeking any of the management fees for the 2011 fund, was she? Yeah, yeah. Well, what she was seeking was Greg, and here's another part of the deal that I think is troubling and I think it should be a point of concern for this court. What Greg and his partners gave up aside from, they gave up their services, their future services going forward. Greg also signed a non-competition agreement which says that if he was fired or left this deal, he couldn't compete with these people for two years. They also gave up half of their management fees and carry interest, roughly half, okay? They gave that up going forward in exchange for the ISC and the burnout shares, okay? And that was contingent, again, upon the personal services and the success of Greg and his partners in reaching a benchmark. You saw the $400 million that they have to raise. And again, this is all going off into the future. Now, the Lazard agreement or this Lazard transaction wasn't created with Greg's divorce in mind. These people did this deal and they wrote a series of contracts, but they created one deal. And I think what the problem for the trial court was is that it took that, it took what that Lazard transaction spoke of in terms of consideration and imported that into or tried to apply that to what the PSA was doing. And you can't do that. Again, that PS, that Lazard transaction didn't even exist until after the PSA, the property settlement agreement had, you know, years afterwards. But they knew, I mean, it's obvious if you look at the whole history of this particular case, they knew something was in the wind. Absolutely. And I think they also knew it was Lazard who was in the wind. Indeed, there was an interested party. And again, Mr. Jones disclosed that before the property settlement agreement, but the particulars of how this deal was structured, well, were not known to Mr. Jones or anyone because that was the subject of negotiations between the Edgewater partners that were subsequent to the party's divorce and Lazard itself. And I think that that is really the big problem here was this conflation of that. And again, you know, they signed this two-year agreement. So in other words, the trial court was looking to Lazard's definition of it. And this is an incredibly complex transaction with all sorts of moving parts, many of which were structured in terms of tax considerations and all of that. But again, I think that if you look at the act and you look at the case law, one of the important overarching goals of the IMDMA, that is the Divorce Act, is to separate the parties going forward. And what now, the net result of the trial court's decision here, has an effect to make Karen a partner in Greg's business deals going forward and also this deal could go on. This deal could have her sharing in his income for the rest of his career. And I cannot believe, first of all. But if the ISC and Earn Out were actually part of the global agreement and not separated out in relation to the 2011 fund, you would agree that she would come in for some of that, correct? No, because by the terms of the agreement itself, Judge, the two paragraphs, the two sections that I read to you, Sections 18.1 and Sections 11, specifically carved out that she was only going to receive consideration for the 2001 and the 2004 funds. And this deal, by its very nature, for personal services, she's not entitled to. And the agreement itself says she's not entitled to receive consideration for his personal services going forward. Well, one of her arguments, though, is that even if Greg is gone, if he doesn't do any additional work and the other partners meet that goal, he still would share in that. So why? So it's obviously not personal service of Greg. Well, respectfully, Your Honor, that's not correct because, as I explained. But that's her argument. Oh, yes. Respectfully her argument. I didn't mean to suggest you weren't. If Greg and his partners do not personally raise the money, they get nothing. Okay? But if they do raise it and he's not there, he still gets his share of the ISC, and you're not correct. Well, that ignores the fact that he and his partner, Mr. I forgot his name now, but they're the ones who are the main rainmakers here who are having to go forward. Again, it's like I said, if you have lawyers, performers, accountants, all these corporations and all, you know, this had created a whole cone, created all sorts of different entities. And if, for example, Madonna has a contract through a company of hers to perform a concert, she still needs to perform the concert, irrespective of whatever agreement that she might have. And that's the thing here. This idea that somehow Greg would not be, that Greg would still continue to receive this money is belied by the very reality that it's Greg and his partners who Lazard is their services, and it's these rainmakers, if you will, that is what Lazard wants. And to say that he could simply walk away, well, who's going to raise the money then? Well, what about the argument, is this really future services? I mean, that argument's been made, too, that you say these are future services and those were not contemplated. Is this 20, are these ISC and earnouts considered future employment, or are these, is there something different? Well, he receives these in exchange for reaching, for providing future services, and that future, and the- But that's, is that future employment? Because she's not entitled by the agreement, as I read it, to future employment. Well, yes, one aspect of the agreement is these services he's being employed, he has an employment contract, is one of the agreements that exist there, and as part of that he also has a non-compete. And the measurement of whether he has fulfilled that part of the bargain is whether he meets that first $400 million benchmark in terms of fundraising. And, you know, they also had another argument that Karen's counsel made, that, you know, he could still be fired and still get the stock. But what that ignores is it, again, ignores the non-compete agreement and that that was a severance. The idea that he could, that they could simply, the fact of the matter is, is if he gets fired from working for Lazard, he can't do anything for two years. He literally, and this is his profession. So his being able to keep that is a form of severance. He can't do anything right here. There are places he might be able to do things. Right, I'm sure, but he could not act, he could not work in the industry that he's been working all these years in his life. He had to go off and do something else. Your position, there's no material issues of fact here. Is that your position? That's correct. So that actually we should reverse the trial court and grant summary judgment for your client, correct? Absolutely, based upon what you're talking. It seems like there are a lot of, you know, you're talking about the future, what might happen, what has happened, but there's no issue of fact. Well, no, Your Honor, what I was trying to understand, discussing, you don't understand what could happen, what might happen, what has happened. Well, Your Honor. Those are fact questions, aren't they? Well, no, Your Honor, I think that what we have here is. Look at the language, and this is what could happen. Well, right, but what I was exploring with you is how the agreement I was watching was addressing certain contingent. Oh, what I was trying to address is the way the agreement would address certain contingencies. Right. But I think, again, the trial court's inquiry should have ended after reading those two paragraphs because it's specifically carved them out. Mr. Adams, if you want to sum up so that we can let Mr. Leavitt proceed. Oh, okay. Well, again, I would look back to those paragraphs. I would look to, and again, I believe that the fundamental error was that the trial court did not, that it did not understand the two-part aspect of this transaction. And then I would say this, assuming Your Honors don't agree with me, again, I think that it's important that this court, if that were the case, recall that some sort of adjustment or credit should be made on remand for the, Greg and his partners gave up a capital asset in order to obtain these ISC earn-out shares. That is, they gave up their future management fees and their future carry interest going forward. And in exchange for that, Karen hasn't given up anything for that. She gave up her marital rights for the 2001 and the 2004 stunt, but here he has given a capital asset that he acquired after the marriage in exchange for that. And I think that that's an issue. Again, I don't think you need to go there, because I think paragraphs 18 and 11 speak to that. But I think that that should be a concern. And I would thank you for your time this morning. Thank you. Mr. Levitt, we won't ask you to dance in light of your back injury, but welcome. Okay. So you know it was my back. I particularly wanted to argue this, so I personally thank the Court. And the reason that I particularly wanted to argue the maintenance issue is that the main case that is being cited to Your Honors as a basis to either reverse or affirm is Blum v. Koster. And Blum v. Koster was argued before this Court and then later in the Supreme Court. I argued it. And as it's being argued here, I have a particular familiarity with it. That's of no moment. But what is of moment is that the trial court brought the wrong argument, and it's being urged on you here. And why do I say that? Well, what are you ultimately asking for? I'm asking that the maintenance obligation terminate for a couple of reasons. And let me give you the reasons. First, you're given the wrong law. And I say that because if you go to page 33 of the response brief, A, bolded, first page of the maintenance argument, because there has been no substantial change in circumstances under Section 51085 of the IMDMA, the Court could not terminate maintenance altogether but could only modify the amount of maintenance under Parties MSA. Wrong. I'm sorry. I'm being emphatic. But that's wrong. Why is it wrong? So let's cite Blum v. Koster, which they've just cited in the brief. Here's Blum v. Koster. The parties' marital settlement agreement here specifically provides for maintenance reviewable after the 61-month period. In viewing the agreement as a whole, we find that the parties agree to a general review of maintenance. Now, review is provided for in our agreement. Thus, Stephen did not have the burden of proving a substantial change in circumstances. Wait a second. What did they just say? There was no burden where review is provided for. And review is provided for. So how is there, A, what they've urged the trial court, which the trial court bought an accurate statement of law that the trial court should have bought, and which is now, again, in the brief being argued to your honors. Didn't the MSA say review of amount of maintenance? There were two motions filed, your honor, that were of concern in December of 2014 before the trial court. The first was an amended petition for review and modification. And speaking only to review, which the PSA allowed. There's no question about that. And there was then a subsequent petition filed in 2012 for determination. And what was the basis? Distributions that Karen had received. And what was the amount of the distributions? Trying to make it quicker for your honors. What was the amount of the distributions? She had $6 million in investable assets stipulated. Justice Burkett, no fair question. Stipulated at the time of the bench trial. This trial was filed in stipulation with a return of 6.4%. But that was contemplated. That was contemplated by her receipt of something was contemplated. Love the question. It wasn't going to be a dollar. Love the question. Love the question. Because that's going to be the second mistake that's going to be made here. It was a statement, but that's okay. I'm sorry? It was a statement. I say the order, the judgment contemplates that she would receive something. It doesn't. Okay. What it contemplates is, you know, this was, again, Justice Burkett. Well, in the future, maybe. Let me give you this example. If an oil well was given to Karen. And the oil well had no earnings. But then later in the course of post-decree life, the oil well is sitting in the largest And now all of a sudden she has income beyond it. So you can't come in with a petition to terminate maintenance because it was contemplated. That's the 2011 fund. You didn't know what was going to happen. That was your question also, Justice. But the 2001 and the 2004, which were contemplated as part of this division, they had money. There was value to them. But that's not where she got her $6 million. Her $6 million came with later distributions. And by the way, it wouldn't matter whether it was contemplated or not under the review provision because distributions are specifically allowed to trigger the review. So under the review provision, forget that it was contemplated or not contemplated. And by the way, one of the confusions in this case is the term contemplated. And why do I say that? Take their best case, Laird. They cite it to you. In Laird, the husband came in and said, I want a reduction in maintenance. And he based it on the wife now had full-time employment. And they said in Laird, this is the case they cite, in the PSA, in the MSA, you specifically excluded. The husband gives up the rights specifically, specifically, and expressly to come in and argue as a basis for a reduction in the maintenance, the fact that wife had full-time employment. So the court rules, this is their case, that because it was specifically and expressly provided that you couldn't come in on that ground, husband, you can't and you've waived it and you've contracted for it, it was contemplated. In this agreement, you have just the opposite. It is contemplated exactly the opposite of what they say. Distributions are a basis for review. And as a basis for review, despite they say you can't terminate, you can only modify, which the trial court accepted, it accepted it in error. Look at the Laird case. They cite another case, Newman, which is a little bit more problematic, but really says the same thing. And Justice Cook, in his dissent, says be careful where you're going with this contemplation because if you do contemplation, you'll never have modification. This is the slippery slope that they have you get. I was going to say you guys. I'm sorry. It's what you justices are being asked to accept. It's the wrong argument. The trial court bought it. The trial court bought that he couldn't terminate maintenance on review when Coster P. Boone says specifically that you can. And reviewability is allowed on the basis of distributions. You don't need substantial change in circumstances. You just need to see if she's got enough. What is the importance, if any, of the fact that this was permanent maintenance? Okay. So is permanent maintenance not reviewable when the terms of the agreement make it reviewable? You know, we use terms in law, and sometimes words become the enemy, like contemplated here if you're not careful with how we apply it. And permanent, which we know is permanent until modification or review, which is provided for in the agreement. It's contrary to rehabilitative maintenance. That's true. And I know what you're asking. But that doesn't mean when you provide for review or when you provide for modification, in fact, just the opposite. Under Coster P. Boone, they tell you very clearly, you can make it non-modifiable. You can make it non-reviewable. This agreement didn't do. It said even though it's permanent, it is modifiable, it is reviewable, and you get to count distributions. But you also said that you're tied to the language sometimes, and the language of this agreement said the amount of permanent maintenance is subject to review. Does that mean anything? Yes. And the amount could be zero. You know, if you don't have zero as an amount, then it could be $1, I guess. But the amount could be zero, Your Honor. And so the amount in this case should have been zero. And why should it be zero? It should be zero because, again, this is a stipulated bench trial. Well, if it's zero, that's not modification. That's termination. Pardon? If it's zero, it's not modification. It's termination. That's not correct again. Why is zero not a modification? Zero and termination are numbers the same. And why then isn't it $1? If you can modify it, what's the sense of it to $1? Why shouldn't it have been $1? And why should it be zero or, let's say, $1 if we accept that argument? Because, Karen, without, again, without argument, without any factual dispute, was $6 million in assets, actually a bit more than $6 million. And that $6 million generated for gang management fees, which are specifically excluded, which in determining whether or not on review or modification what could be considered, that's not to be considered. But not considering that, she's got over $276,000 in after-tax income to support a lifestyle. And that lifestyle, by her own affidavit in that year that this case is being considered, $150,000. When you take out the $9,000 in loyalties that she was paying every month, non-recurring, obviously, and the cost of an insurance policy, which was a capital asset. So if she needs $150,000 and she has $276,000, how is her lifestyle, and again, why am I talking lifestyle? So the MSA also, the PSA also says, consider 510 and 504 of the act. And what does 510 and 504 say? So, Your Honor, you have to follow the language, right? So the language says, consider 510. 510 says, what assets did you have when you got divorced? What's the value of those assets now? What are those assets earning? So the agreement not only says, reviewable based on distributions, but also this is what you count. And then she agreed that this should be counted. And then she said, this is what I need. So how is, so the court brought two arguments that it shouldn't be. I have a, what happens if we accept Mr. Adams' argument and there is a summary judgment granted in favor of Mr. Jones? Now what do we do with maintenance? Do we, now she doesn't have that, those assets. To remand it for a determination, of course. You know, and perhaps there has to be a remand for the retroactivity, which I, and, you know, again, I don't know. But I feel confident that once you take a look at the layer case and once you read the reviewability again and the modification aspects of the PSA, that you're going to reverse on the maintenance. Then the issue becomes also retroactivity. And how much should, Mr. Jones loses a million dollars for not getting retroactivity. You know, Judge Yukonaut in this case was the judge before the trial judge who entered the order. Judge Yukonaut, in 2010, when the initial petition was filed, said as a distribution of a million dollars had already been received, I'm going to make this retroactive and entered an order. It's retroactive to July 12, 2010. He understood it at that time. But the trial judge isn't bound by that. Well, he said I'm not bound by it. But Judge Yukonaut actually was right. He said that that distribution should be counted. They said no, it was contemplated. The second judge said no, it was contemplated. Wrong contemplation. Wrong contemplation. Wrong on reviewability. Wrong, Your Honors, I've made the argument, and I think you folks understood it from the questioning. This is just a wrong decision. An innocent staff decision was wrong. But the point is, and you're right, Justice Hutchinson, if the summary judgment goes the other way, this ought to be remanded because and even if it's remanded only on the maintenance issue, there should be remand to determine what the appropriate retroactivity should be. It should not be based on the trigger of the youngest child's emancipation. That's just wrong as well. So I thank Your Honors for your consideration. I hope that when you read Casterly Bloom, their case lair, Newman, which is also cited, Whitley, Justice Cook dissent, which is, I think, brilliant, I don't think there's any doubt that the maintenance issue is reversed. And, Justice Hutchinson, you're concerned if you go the other way on the stop. So you remand it and you let the trial court figure it out. This trial court is bright. And with direction, it will do the right thing. Thank you, Your Honors. Mr. Lieber? Good morning. Good morning. From our perspective, this case involves unambiguous contract documents. I believe there is a stipulation in the record that these documents are not ambiguous. So, of course, we look at the – Well, if there is a stipulation that they're not ambiguous, and if that's the case, why don't we read 18-1, or 18-2, I think it's 18-1, though, and 11 as suggested by Mr. Adams? We have never been seeking an interest in Fund 3 or the 2011 fund. That's been stated in court. It's in our briefs. It's everywhere. The Fund 3, the interest in Fund 3 would be received by Mr. Jones in the form of carried interest, in the form of management fees. We don't want any carried interest or management fees from Fund 3. We want nothing from Fund 3. And if you look at the consideration, and from our perspective, consideration is the critical word in the case. It's a term of art. We're obviously in a court of law. And Section 11 clearly distinguishes the consideration from Edgewater from the consideration from future services. Consideration defined in the case law is the bargain for exchange of promises or performance. And if you look at the marital balance sheet, where you have essentially Fund 1 and Fund 2 at that point, Line 34 and 35 is Edgewater Management 4 and Edgewater Growth Capital, you can take that all the way to the property settlement agreement and identify the consideration, which is the cash and the shares. Did Mr. Jones give up carried interest and management fees in the 2011 fund in order to receive the ISC and earn out shares? No, Mr. Jones gave up what is identified as the acquired interest in the property sale contract. And that acquired interest can be taken back through the reorganization agreement right back to the marital settlement agreement for the Line 34, Line 35, two funds, the 2001 fund and the 2004 fund. That is what the consideration is clearly for. So the ISC and earn out shares are consideration for the earlier funds? Correct. According to the property settlement agreement, there are three components to the consideration. Even though they may not come to fruition ever? Well, they have, but at the time it was signed, correct. At the time you didn't know they were. No, at the time, correct. Karin's position was essentially if, as, and when. Does he get the same amount of carried interest and management fees from the 2011 fund as he did from the earlier funds? Those percentages were not part of our case. They were negotiated between the parties to the property settlement agreement. He gets a component of his management fees and his carried interest from fund three, the 2011 fund. We've never made a claim to those. Excuse me, Nick. Yes. Mr. Adams or Mr. Levitt, could you talk with, I assume you're a client. This is not a trial court. We're not taking answers from him. We're listening to you. Thank you. Go ahead. The consideration goes through the reorganization agreement, and it's very clear if you look at the reorganization agreement, it will go right back to the balance sheet. So what we've specified in our argument from Edgewater Holdco, Greg gets like 4,451 class one units. If you look at the acquired interest in the property settlement agreement, 100% of it goes to Lizetter, and it's the same through all the class one and the class two units and the class A units. Those are units that came from the 2004 fund and the 2001 fund. They did not come from the acknowledged to be non-existent at that time, the 2011 fund. But clearly the work that is being done, I'm not going to use the word future at this point, but clearly the work that's being done by Mr. Jones and his colleagues, his partners, is post-judgment. It is. And it would, under most marital circumstances, not be considered in any way marital property. How did this agreement somehow make it marital property subject to distribution? The property settlement agreement, I believe, is properly interpreted with the ISC shares and the earn out shares being either subject to a condition preceding or arguably even a condition subsequent. Well, to what? To raising the money and earning the fees. But for what? The 2001 and 2004 or the 2011? Or aren't they part of anything? It was the fees had to be earned and the money raised for the 2011 fund. Once that occurred, it is our position that the condition preceding to Edgewater, excuse me, to Lazard having to pay was lapsed. Those were the conditions. In fact, I believe it is even referred to in one of their memos by one of the attorneys for better prices as like a benchmark that had to be reached. They did have to reach the benchmark. Otherwise, there are no shares. But once the benchmarks are reached, that doesn't change the clearly identified consideration in the purchase agreement. The sales agreement itself, I believe, in section 1.10, talks about fund three minimum allocations. And what's going to occur is the sellers are going to get carried interest for fund three subject to vesting. And that's what the hiring has no interest in. It's right in section 1.10 of the property settlement agreement. The consideration can't be changed. The consideration, it's identified as consideration in section 1.01 of the property unit. Cash consideration, IFC consideration, earn out consideration, they lump it together as consideration. Who drafted the marriage settlement agreement? I believe both parties were. Who was the main? It was before my time, Judge. I want to amend who drafted the property settlement agreement. It was done at the same time. The argument for consideration for future services that we've advanced, I think it's pretty clear. He gets his wages, $750,000. He gets fund three, fund four, whatever other funds come in the future, his management and his carried interest. I don't know how they can really argue that section 18 is determinative when no one is seeking the management fees and the carried interest from fund three or fund four. To us, that's what ownership is. It talks about his ownership interest or his interest. Well, the issue is if the IFC and earn out are tied to the 2011 fund, then their argument makes sense. And if it's not tied to the 2011 fund, then your argument makes sense. It is tied to it. But I think that what's controlling here is identifying the consideration because this is a contract. So we're looking to see what the consideration is. And the consideration for the Edgewater interest were the cash and the shares, identified the IFC and the earn out shares. So part of the consideration, I'll get back to my other question, part of the consideration had nothing to do with Mr. Jones giving up certain things in the 2011 fund itself. I agree. I don't think he gave up anything. He gave up nothing in the 2011 fund. Not to my knowledge. We don't want anything from the 2011 fund. No, no, no. I'm just saying. Oh, okay. The argument is he gave up part of his management fees from the 2011 fund in order to get these shares that might come to fruition in the future. I don't believe that's correct. Mr. Jones will receive 100% of his management fees without any claim by us. The same for the carried interest. If the day after this agreement was signed, he decided to go sit on a beach in Vermeer and do nothing, and the money wasn't raised, the $500 million or whatever, the $400 million, wasn't raised, nobody would have gotten a dime out of these earn outs. That's correct. Okay, so you think your client may have had the right to file a rubrical clause for him to come in and say, why aren't you trying to give me my money? No, I think that you can't say a hold co is the individuals and the individuals are a hold co. It's a pretty basic premise that they're separate legal entities. So I don't think you can interchange them like they do at their convenience. It wasn't, Greg. It was the LLC. And if the LLC made the benchmarks, raised the money, earned the fees, the shares got paid, period. That's the contract. But the question is, what did they get paid for? Okay. The counsel says they got paid for giving up certain things that would not have been part of this property settlement agreement between Mr. and Mrs. Jones. And you say that's not true. That's not what the contract says. Which contract are we talking about? I'm talking about the purchase agreement between Lazard and the other parties where And you say that because they're all called considerations. I am saying that because the contract identifies that Greg and his partners are giving to Edgewater their interests in the 2004 fund and the 2001 fund. And that is fund one. And fund two is identified in the reorganization agreement. And that is what is clearly and distinctly sold. And she did get distributions from 2001 and 2004 funds, correct? She did receive distributions, yes. And what was that amount generally? I can't. It wasn't part of the litigation that I was personally involved in in this aspect. So I don't know. She did receive funds, and I believe that called for the review of her maintenance but really didn't impact the issue with the stock because the purchase agreement delineates the class one, the class two shares, and the units and the class A units that are being sold to Lazard. And then, excuse me, that Greg acquired from Holdco and then sold to Lazard. And they all clearly go right back to 2001 and 2004. There are no 2011, you know, there's no significance of the 2011 fund in the consideration aspect of the property settlement agreement. And, again, they called it consideration. There's no language in the property settlement agreement, I believe, that supports the position that these are somehow, you know, disguised wages. Well, we have no interest. I don't think they're calling them wages. Based upon my argument in my reading of the brief, they're not calling them wages. You seem to think they are, but why do you think they're calling them wages? My point is that his consideration for future services would be the $750,000, the management fees, and the carried interest. That's our position. And the LLC agreement even indicates they expect to award 50% of the management fees. I would also like to point out that it wouldn't be Lazard's shares that they would receive for some kind of future investment services. They would receive cash. Do you want to talk about the maintenance at all? Yes. This is permanent maintenance. It was a contract that specified the conditions where the maintenance could terminate, death by the party, remarriage, cohabitation, and conjugal relationship. None of those events took place. What took place was a review by the trial court, and an order entered based on the younger children, the children becoming emancipated. And in the review, the court considered the income differential between the parties, and in response to counsel's argument, it's the standard of living during the marriage, not the standard of living later on. One of our exhibits in trial, in the trial court, was Karen Jones' disclosure statement from the divorce case itself, and that showed a standard of living of approximately $20,000, $25,000. She has no realistic earning capacity, and the court significantly reduced it to $7,500, which will be taxable to her. She is going to have to access her assets in order to survive, and the trial court did consider all of the factors in 504 and 510 because they weren't put in play by the agreement. So certainly, I think it would be difficult to conclude that no reasonable person, you know, could come to the decision the trial court did in reducing the maintenance to $7,500. His income is on his tax returns. Her income are on her tax returns. They're all in evidence. They argued in their brief we were misleading because there was a typo that referred to a 2009 return as a 2010. Judge Yukon said on 7-12-10 that it made any change that would be retroactive to that date. Hadn't a trigger event occurred on or before 7-12-10 triggering the person to the property settlement agreement? Not to my knowledge. So that she had received no payments from the agreement by that time? I can't answer that question. She hadn't received $860,000 as partial payment for the, you know, for the sale of the company? I can't answer the timeframe, Judge. I do know that she did receive distributions, and I also know that the trial court ruled that the modification was based on the emancipation. So at that point, he modified it going forward. Right. Judge Yukon had it ruled differently back in 2000. Right. But the relief that was granted wasn't granted on the petition that was filed back then. I think it was granted on the subsequent petition. So there wasn't a trigger event. If a triggering event occurred, as Justice Burke had mentioned, and we find that that is accurate, why would the trial court not honor that original date that Judge Yukon had entered? I believe it was because the relief was granted on the subsequent petition, but I understand the court's point. There were two petitions filed here, one for review that Judge Yukon looked at and then one for termination that both, and then he looked at both of those theoretically. Judge Morrison, I guess? Yes, correct. I can move on to the cross appeal. You can do that quickly. Sure. The issue is subject matter jurisdiction. The trial court agreed with our motion to reconsider that there was subject matter jurisdiction for the declaratory judgment. I don't believe there's any basis to distinguish the contract claim. Obviously, it's court of general jurisdiction. The trial court, when they granted our motion to reconsider, did not even really provide any explanations to why it was granted as to our motion to reconsider was granted as to finding jurisdiction for the declaratory judgment but not the contract. Was it your firm or a previous firm that filed the deck action and the contract action? We filed it. I drafted it. And so in this particular litigation, what was the purpose of that? What was the design? We had petitions for rule-of-show clause vending. We had a petition for termination, a petition for review of maintenance. What did these two counts do that was different from anything that had been filed? There was not a pleading on file by our office that addressed the earn-out shares.  The petition for rule, I believe, just addressed the initial stock consideration, as we would not have known at that point that there were any payouts on the earn-out shares, on the earn-outs. So that was one reason we filed it, because we did not see a pleading that addressed that issue. And I also did believe that they are unambiguous contract documents and it is a question of law. All right. Thank you. Thank you. Mr. Anson. I saw that slide at one point. Thank you. I'm OCD. I had to fix this thing. I was coming over, but it wouldn't have been pretty. With respect to the stock issue, Mr. Rueber's argument begs the question of what did Greg get for the 2011 fund. If you accept what Karen has argued here today in her briefs, it's that Greg got nothing for the 2011 fund. And that makes no sense, as it is the development of that 2011 fund, which is what animates the entire Lazard deal. And also, I would mention that Mr. Rueber mentioned a memo that was talked about in there, and that memo was the Nemerov memo, and I believe it's in our briefs there, and that speaks to that point. So you have all of this consideration as it's defined by the Lazard agreement. And what Karen has argued is that it's all for just the 2001 fund and all for the 2004. Again, that can't make any sense, because then what was Greg getting for the 2011 fund? Nothing. Surely he had to get something, especially, again, as I said, it was the development of that fund, which is what Lazard wanted. And what they set the $400 million benchmark for. And I would just add one point more on this. Well, let me ask before you go there. Please. Mr. Rueber said that nothing was given up by Mr. Jones in the 2011 fund. Your position was different in why you say he gave up 50% of his management fees and something else, I believe. 50%, right. The way that people who run these types of funds like Greg get, they get their money for the management fee, which is just a fee that they get no matter what for managing the sum of money. And then they get a carry interest, which is a certain percentage of the profits beyond if the fund reaches a certain level of profitability they share in that. So what he gave up going forward in exchange for the ISC and for the earn-out shares was the fees, the management fees and the carry fees for the 2011 fund going forward in exchange for those ISC shares. And that's what he gave up in exchange to also agreeing to provide those services and reach those benchmarks and signing a non-competition agreement as well. Why are there two levels, the ISC and the earn-out? Could one be applied one way and one be applied to the 2011? No, they were both hinged on the development of the 2011 funds. And they were both hinged on reaching certain specific benchmarks with respect to the 2011 fund. And I think that this actually nicely dovetails into the point that I was about to make. What if Greg and his partners had not done this deal? After they got divorced, the Lazar deal fell apart and Greg went and developed the 2011 fund, which again, I would remind this court, he had no interest in until 2011 itself. He had no interest in it. And while it was certainly referenced in that agreement, he obtained no interest whatsoever until a couple of years after the agreement had been signed and after the Lazar deal and after the parties had gotten divorced. What if they had not done this deal when the deal collapsed with Lazar? Going forward, he'd be collecting those management fees and those carry fees if they had decided to simply, the Edgewater partners had simply decided to go forward with the 2011 fund and develop it themselves. Does your argument be lied at all by, I think counsel pointed out section 1.01 of the agreement, the purchase agreement that he said lumps consideration together, that lumps the earn-out and ISC as consideration for the whole deal? I believe that's the section. Well, again, what that does is it goes back to the other argument I made is that it conflates the idea of what consideration and how they structured the Lazar deal. Again, a deal which was not created and which was not, when they created this Lazar deal, they weren't thinking about Greg's divorce or his property selling agreement. And what they've allowed, and if you look at the deal, it's got really two parts to it. They're buying out these existing firms, their existing business, if you will, so that they're becoming full partners with Lazar. And then what they're buying is this new, nascent, undeveloped fund. And what Karen's argument did and what ultimately the trial court accepted is it conflated that idea of consideration, which was one omnibus agreement. They don't need to break it into those two parts there because they were doing this deal without respect to Greg's divorce. And what they did is they conflated that consideration into that. And in the process of doing that, Greg got nothing for the 2011 fund, if you accept what Mr. Ruber just said. And that just doesn't make sense when, if you look at the deal itself, it's the development of the 2011 fund that animates it. That's what they want. They want Greg and his partners to raise the $400 million, then raise another benchmark, and to continue on, and also to raise future funds going forward. This is a deal for the rest of his career. And respectfully, Judge, if this is allowed to, if this doesn't get reversed, it's going to have a devastating effect on him. And it makes him, it makes Karen a partner with the Lazard partners, and it gives her a claim on his income for the rest of his working career. And respectfully, that's not what Mr. Jones bargained for. So that's what I would say with conclusion to the stock agreement. With respect to the cross-appeal, Judge, and if you look at the, my reply brief to that, I would simply just reiterate again that I'm not, at no time has Greg ever quibbled with the holding of the Isaacs case, which was relied upon by them in their brief. The circuit court of Lake County, like any circuit court in the state, is a court of general jurisdiction. And, of course, it has jurisdiction over any type of action. The type of divisions between domestic relations, criminal courts, chancery law, what have you, municipal, are all simply for convenience. It does not in any way act as a restriction upon the power of a circuit court judge to adjudicate any justiciable claim under our 1970 Constitution. But that's not what we're arguing here. What we're arguing here is that, unlike the Isaacs case, where the husband had filed a collateral action in the circuit court of Cook County, in addition to his divorce action, that's not what occurred here. What occurred here is that the property settlement agreement, which is governed by the law of contracts, it's true, it's governed by and it's construed with the law of contracts, necessarily merged into the judgment when the judgment was entered under the merger doctrine. And in my brief, you have three cases, three quotes, which explain that quite clearly. Once the contract, while it still needs to be construed under the law of contracts in terms of how it's read, merged into that judgment, at that point, both parties' rights are purely a function of that judgment. And in that situation, the remedy that Mrs. Jones has or Mr. Jones might have for a breach of that property settlement agreement, or more correctly, a breach of the judgment which incorporated that property settlement agreement, is to file a contempt petition or file a petition for enforcement. It's not to file a collateral contract action seeking contract damages. That separate contract doesn't exist anymore as a legal concept. It merged into the judgment. And that doesn't prevent, that's not a jurisdiction issue, and that doesn't prevent the judge from hearing it. It's actually designed, I mean, it would be designed to make it easier, more judicially efficient to hear these actions together and, as Mr. Ruber said, take into account the earn-out shares which he felt had not been dealt with by the previous petitions for rule. Well, but if you look at what their pleading was, it was a two-count pleading. One was for a petition for declaratory relief, which would come under Section 2-701 of the Code of Civil Procedure, which itself is a, which could be an action as well, but it can be filed as a collateral action or it can be filed within the context of another action. And then he filed an action for a breach of contract. He doesn't, with all due respect, he doesn't have a contract to sue on because that contract, it's not like they had a separate contract between the two of them. They had a contract, but they signed that property settlement agreement, and again, it merged into that judgment. He cannot sue upon that. It's the same as if I had gotten into a dispute selling bushels of apples with someone, someone got a judgment against me, and that was reduced to a dollar amount. They can't now go ahead and sue on the contract if I don't pay on the judgment. But what's the difference between a petition for enforcement and a petition for breach of contract in this type of case? They're both alleging the same issues, aren't they? Well, I think that when you have a contract action, you can choose all sorts of different types of damages. You can go for expectancy damages. You can go for benefit of the bargain. There are all those things that go back to contract law. Which would be considered in the disposition of a petition for enforcement, wouldn't they? Right, but in a petition for enforcement, I think the court would be limited within the context of either an enforcement petition brought under the Act itself or under a contempt petition brought under the court's general contempt powers, would be limited to simply enforcing that. And by enforcing that, it could say, well, I'm going to order you to hand over the stock. I'm going to order you to pay over this amount of money. It's not going to do an investigation into expectancy damages or engage, indulge in any of these different types of contract theories. Are you arguing this is an alternative basis to affirm the dismissal? Or are you arguing it on the grounds that there is no valid claim? Are you arguing it that the trial court did not have jurisdiction over that claim? No, I'm not arguing that the circuit court is a court of general jurisdiction. It has jurisdiction. Of course it has jurisdiction. Right. What I'm saying is there's no claim. There's no claim. There's no claim because the contract says so. Well, they can certainly bring the action, and then you file a motion to dismiss. Right. And it's dismissed. Absolutely. Absolutely. But, no, I would never argue that the court did. It certainly had that power. And then I'd like to turn over my time to Mr. Lovett. Thank you very much for your time today, judges. Mr. Lovett. Try to leave the microphone intact, if you would. Pardon? Try to leave the microphone intact. So you don't jump over the fence and help me out. And so Mr. Adams doesn't do the same. I'm older. I take liberties. I don't know. Counsel for Mr. Jones filed the amended petition to review and modify maintenance in 2009 after an $865,000, Justice Burke, this is the answer to your question that Mr. Ruber couldn't answer, after an $865,000 distribution. It filed for review because distributions permitted review. And what was requested in that 2009 petition was just a reduction of $3,500 based on income that that $865,000 was. And that was filed in 09, correct? Correct. And there was one filed in 12, but that was to terminate. Pardon? That was to terminate. The petition filed in 12 was to terminate maintenance. Yes. And that was based on the additional distributions that had taken place post-Judge Yukon's 2012 order. But I think counsel's argument was, maybe I'm mistaken, but I thought his argument was that the relief was granted on the 2012 petition, therefore, it would be inappropriate to grant retroactivity back to 7-12-10. And that's wrong. The relief was granted on the 2009 petition. It was not granted on the 2012 petition. The opposite of what he said. And that's the one thing I wanted to step up and correct. As the Court found in its December of 2014 order, review, meaning on the earlier petition, was where the relief was granted, not on the subsequent termination petition, because they bought the argument that he had made below, which I said was invalid in my earlier remarks. Because distributions are permitted for review, modifiability is not dependent on substantial change in circumstances, though you certainly had it. You had it because you had the $6 million, unless you accept, Justice Hutchinson, the contemplation argument, which, again, I tell you, don't accept, because you'll kill maintenance modification in the State if you do, which is in part why I wanted to argue this. It's a very dangerous argument that they make. And Justice Cook notes it in his dissent in Newman. And when you read Newman, you'll see, with Blair, that it still endorses the position Mr. Jones is taking here on the maintenance, but warns of, if you misinterpret Newman on that very term, contemplation, look, anything that you get can later make money for you. And if it does, unless you've specifically and expressly excluded it, look at Blair, you get to count it for modification. That's the simple argument that I make to Your Honors. And I thank you for your time and all of your consideration. Mr. Rubin. In terms of the jurisdiction issue, obviously the counsel agrees that the trial court had jurisdiction. I believe the appropriate thing for this Court to do would be to grant our appeal and reverse that. In terms of the maintenance issue. And what, if we reverse that, what would you be then asking for? I would be asking for this Court to enter an order that affirms the trial court and their ruling on the declaratory judgment, which in essence is, I believe, a ruling that there is liability on the breach of contract count and it should be remanded for a hearing on the damages. And what damages would you be asking for? The damages would involve the money that Karen Jones would need to put her in the same position she would have been in had she received the initial stock consideration in your now shares in a timely manner. So in minimal, that would be 9%, I believe, judgment interest from those days. And you could get interest on a motion or a petition to enforce, couldn't you? If you were successful in that. Yes, you could probably get it on the declaratory judgment, but we think it's appropriate and correct to have a breach of contract count also. But there could certainly be some follow-up. How would this be litigated differently than it has been litigated? We would have had a summary judgment ruling, I believe, on the breach of contract case, breach of contract claim. So that, I mean, obviously you're entitled to your strategy, but you believe that with a summary judgment on the breach of contract, what would that get you or what was, I hate to use the word contemplate after we've used it so much today, what was the purpose or what were you seeking with a summary judgment on a breach of contract case? I was seeking to posture the case so there would be no limitations except for what the facts and law required in terms of her damages. And I thought breach of contract was an appropriate pleading to do that, even though certainly under the other relief provisions of the declaratory judgment statute, that probably could be awarded there also. I would just like finally to point out paragraph 26 of the trial court's order, where it says Karen's receipt of $864,000 in July of 2009 as part of her sales consideration received by Gregory for his portion of the controlling interest in that order. Is this under the rateness argument? Yes, I'm sorry, Judge. Well, this is your chance to cross or your rebuttal on your cross-up. What does this have to do with that? I'm sorry. It's my mistake. Thank you. I thank you all for your argument this morning. We will take the matter under advisement. We will render a decision in due course. We now stand recessed. And thank you, gentlemen.